UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| POLEAN K. WARE, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:09cv00740 (DJS) |
| | : | |
| PATRICK R. DONAHOE, | : | |
| POSTMASTER GENERAL | : | |
| Defendant. | : | |

MEMORANDUM OF DECISION AND ORDER

The plaintiff, Polean K. Ware ("Ware"), brings this action against the defendant, Patrick R. Donahoe[1] , Postmaster General of the United States Postal Service ("Postal Service"), alleging that he was subjected to disparate treatment and retaliation on account of his sex, race, color, and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Age Discrimination in Employment Act ("ADEA").  Jurisdiction is invoked under 28 U.S.C. § 1331. The defendant Postal Service now moves for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, the defendant's motion for summary judgment (doc. #62) is granted.

BACKGROUND

Before reciting the facts which the Court finds to be undisputed, the Court wishes to address an issue concerning the plaintiff's filings in opposition to the defendant's motion. The Rules of the United States District Court for the District of Connecticut contain specific requirements pertaining to papers filed in opposition to a motion for summary judgment. Those papers must include a "'Local Rule 56(a)2 Statement,' which states in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 and corresponding to the paragraphs

---

[1] Patrick R. Donahoe succeeded John E. Potter as Postmaster General on December 6, 2010. Pursuant to Fed. R. Civ. P. 25(d), "when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[,] [t]he officer's successor is automatically substituted as a party."

contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied." L. Civ. R. 56(a)2.

In the Local Rule 56(a)2 Statement, each denial of a fact asserted by the moving party "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. . . . The 'specific citation' obligation of this Local Rule requires counsel and pro se parties to cite to specific paragraphs when citing affidavits . . . and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." L. Civ. R. 56(a)3. Failure to provide this specific citation "may result in the Court deeming certain facts that are supported by the evidence admitted . . . ." *Id.*

In opposing the defendant's motion for summary judgment the plaintiff filed a one page document containing columns in which he listed paragraph numbers for "Facts in Dispute" and "Facts Not in Dispute." (Doc. # 70, at 34). In its reply to the plaintiff's opposition, the defendant noted that the plaintiff's one page submission contained no citations to the record and contended that Ware's response to the Local Rule 56(a)1 Statement was "utterly deficient" in terms of the requirements of Local Rule 56(a)3. (Doc. # 71, at 1). The plaintiff Ware subsequently requested and was granted permission to "correctly respond to the hundred plus proposed statement of facts submitted by defendants with the proper citations . . . ." (Doc. # 72, at 1). Ware thereafter filed a ten page document entitled "Plaintiff's Response to Local Rule 56(a)1." (Doc. # 75-1).

In connection with the consideration of a motion for summary judgment, a district court is not obligated "to perform an independent review of the record to find proof of a factual dispute. A district court is obligated only to consider the materials [properly] cited to it by the parties." *Morales v. New York State Department of Labor*, 530 F. App'x 13, 14 (2d Cir. 2013)

(internal quotation marks and citation omitted). In this regard, the Court notes that "Plaintiff's Response to Local Rule 56(a)1" does not in all instances cite to evidence in the record that supports the plaintiff's denials of assertions made by the defendant. By way of example, the defendant's Local Rule 56(a)1Statement asserts that "Martin testified in her EEO Affidavit as follows regarding her visit to East Hartford Main Street on July 23, 2008," and goes on to quote from the affidavit filed as defendant's Exhibit 19. (Doc. # 62-2, at 25, ¶ 105). In responding to this assertion, Ware cites to specific portions of  his deposition testimony, but the deposition testimony cited does not address the matters addressed in the corresponding paragraph of the defendant's Local Rule 56(a)1 Statement and in the supporting affidavit. (Doc. # 75-1, at 4, ¶ 105).  In another paragraph, the defendant asserts that "Martin stated the following in her EEO Affidavit regarding the May 13th call," and goes on to quote from Exhibit 19, including the statement that "I told Mr. Ware that his flash data looked good to same period last year because we had discovered the volume integrity issue and corrected it." (Doc. # 62-2, at 17, ¶ 76). Ware's response simply states "Data integrity never mentioned." (Doc. # 75-1, at 3, ¶ 76). His response does not cite to an affidavit, deposition testimony, or any other evidence.

The Court notes that the plaintiff is representing himself in this matter, and is well aware that "the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d. Cir. 2006) (internal quotation marks omitted).  However, "*pro se* parties are not excused from abiding by the Federal Rules of Civil Procedure." *Collins v. Experian Credit Reporting Service*, No. 3:04CV1905 (MRK), 2006 WL 2850411, at *1 (D. Conn. Oct. 3, 2006); *see McNeill v. United States*, 508 U.S. 106, 113 (1993) ("we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who

proceed without counsel"). To the extent that the defendant's factual assertions are properly supported by the evidence and the plaintiff's denials of those assertions are not, the Court will deem those assertions admitted. *See* L. Civ. R. 56(a)3 ("failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)1").

The defendant Postal Service has employed the plaintiff, an African- American male who was approximately 52 years old in 2008, since 1985. From 1985 to 2001 Ware held various management positions, but he did not act as a supervisor to any employees until November 2001, when he became a Manager of Customer Service at a Post Office in Pennsylvania. In 2003 Ware transferred to Hartford, Connecticut and subsequently transferred back and forth between branches in Hartford and East Hartford, as well as the Hartford Processing and Distribution Center. After returning to the East Hartford branch in mid-February 2008, Ware was under the direct supervision of Tom Sullivan ("Sullivan"), the "lead" Manager of Customer Service, who reported to Judith Martin ("Martin"), the Postmaster of Hartford.

Shortly after Ware's return to the East Hartford branch in 2008, Sullivan and Martin made several unannounced visits to that location. These visits ultimately resulted in Ware being given a pre-disciplinary interview ("PDI") for the stated reason of "failure to follow instructions." (Doc. # 62-2, at 8, ¶ 31). About one week later, on March 12, 2008, Ware was issued a "proposed letter of warning in lieu of time-off suspension" based on a charge of "failure to perform the requirement of your position [and] failure to follow instructions." (Doc. # 70-2, at 57). This charge was made because Sullivan allegedly observed errors occurring under Ware's supervision and Ware failed to take corrective action after having told Sullivan he would do so. Ware appealed to Martin from the issuance of the March 12, 2008 letter. As a result of that

4

appeal, the letter of warning in lieu of time-off suspension was reduced to simply a letter of warning.

On May 9, 2008, Sullivan issued Ware a proposed letter of warning in lieu of a fourteen-day suspension. Ware was charged with failing to verify the volume of mail at the East Hartford facility over a designated period of time despite having been instructed to do so and informed of the importance of accurate mail counts. Ware appealed to Martin from the issuance of the May 9, 2008 letter.  After a meeting between Martin and Ware, Martin removed the letter from Ware's personnel file because Ware claimed he did not know how to perform the volume counts that led to the issuance of the letter.

On May 9, 2009, Ware visited Enfield Ambulatory Care due to stress and anxiety and was given a disability certificate indicating that he was not able to return to work until at least May 15, 2008. Ware subsequently left phone messages with both Sullivan and Martin informing them that he would be out sick. Martin called Ware at his home during his sick leave. During their conversation, Ware informed Martin that he was trying to obtain a position with the Postal Service in another state. Martin advised Ware that if he wanted to obtain a position in another area he should not stay out or work, since an absence immediately following the issuance of a warning letter would "look unfavorable to anyone reviewing a request for a transfer . . . ." (Doc. # 62-2, at 17, ¶ 76).

In May 2008 Ware contacted the Equal Employment Opportunity Commission and made a formal complaint of harassment against the Postal Service. It is unclear exactly when either Sullivan or Martin first learned of Ware's EEOC complaint, although Ware testified at his deposition that "it . . . had to be prior to . . . May 29th" 2008. (Doc. # 75-5, at 53: 3-4).

On July 26, 2008, route adjustments[2] were scheduled to take place in the East Hartford branch where Ware was a manager. On July 17, 2008, Ware submitted a request for annual leave for the two days immediately preceding the route adjustments in order to be with his daughter in Washington, D.C. for a basketball tournament.  On July 18, 2008, Sullivan denied Ware's leave request for the stated reason that Ware was needed at his branch on those dates to prepare for the scheduled route adjustments.  Ware called Martin from Washington, D.C. on July 23, 2008, requesting emergency annual leave for July 24, 2008, indicating that he could not leave his daughter alone in Washington, D.C. while she played in the basketball tournament. Martin denied the request because of the planned route adjustments. Ware then left a phone message advising the Acting Manager of Customer Service that he planned to be out sick until Tuesday, July 29, 2008.

After speaking with Ware on July 23, 2008, Martin traveled to the East Hartford branch to check on the route adjustment process. Martin determined that tasks necessary to complete the adjustment process had not been completed and that Ware had failed to ensure that those tasks were assigned to employees for completion. For that reason Martin postponed the route adjustment.

On July 17, 2008, Ware requested annual leave for August 9, 11, 12, and 13 in order to help move his daughter into her college dormitory and attend to other family business. Sullivan denied this request because the supervisor who worked for Ware was going to be on vacation those same days, and Sullivan believed there would not be adequate supervisory coverage of the branch in the absence of both Ware and the supervisor. On August 7, 2008, Ware requested that Sullivan reconsider his denial of Ware's request for annual leave on August 9, 11, 12, and 13. In

---

[2] The route adjustments planned for the East Hartford branch involved the elimination of two mail carrier routes and the reassignment of the streets on those routes to other carriers.

an email sent to Ware on August 8, 2008, Sullivan repeated his reason for denying the requested leave. In his email, Sullivan also indicated that he had moved a different supervisor from the Newington branch to the East Hartford branch "so that I would have a supervisor to manage the carriers because again in [sic] Wednesday August 6th you stated that you were not going to be here regardless of my decision. I could not take the chance that you would not show up for work just like you did on Thursday July 24, 2008." (Doc. # 62-2, at 28, ¶ 120).

On or about August 6, 2008, Ware called Ron Boyne ("Boyne"), who was filling in that day for Sullivan, and told him that he was sick and that Boyne should notify Sullivan that Ware was leaving the East Hartford branch and would not be back for the rest of that week. Sullivan, who was filling in that day for Martin, called Ware after being notified by Boyne of the substance of his telephone conversation. Ware told Sullivan that since Sullivan had disapproved his annual leave request, he was now sick and would not be back until the following week. Sullivan then advised Ware that he had contacted the Office of Inspector General and informed that office that Ware had been denied a request for annual leave for August 9, 11, 12, and 13 and that Sullivan believed Ware might attempt to fraudulently utilize sick leave for those days. Despite having indicated that he was leaving work that day due to illness, Ware remained at the East Hartford branch until the end of the work day and throughout the time period at issue.

On September 19, 2008, Sullivan issued a Notice of Proposed Removal ("Notice") in which he proposed removing Ware from the Postal Service based on four charges specified in the notice. The first charge, "Failure to Follow Instructions," alleged that on eleven specific dates in June and July of 2008 Ware "failed to comply with the prerequisites set forth in [Sullivan's] instructions" for scheduling letter carriers who were not on the "overtime desired

list" to work overtime.[3] (Def. SJ Ex. 28, at 1). According to the Notice, managers were required

to request and receive approval from Sullivan before assigning carriers who were not on the

overtime desired list for overtime work and were also required to provide Sullivan with certain

information and forms pertaining to such scheduling. Sullivan indicated in the Notice that he did

not become aware that carriers in the East Hartford branch who were not on the overtime desired

list had been scheduled for overtime work on the eleven specified dates until August 8, 2008, as

a result of grievances filed relating to that scheduling.

In a written response to the Notice, Ware indicated that he was on annual leave when

managers were initially informed of the prerequisites for overtime scheduling in April 2008, that

he could not recall whether he was at work on four of the eleven dates specified in the Notice,

and that it had been his practice to delegate to his supervisors the responsibility of processing

paperwork relating to overtime scheduling. (Def. SJ Ex. 27).

The second charge in the Notice, "Failure to Perform Your Duties Satisfactorily,"

indicated that Martin and Acting District Manager Frank Marshall had observed eight different

problems during an audit of the East Hartford branch they conducted on August 14, 2008.  The

Notice also stated that on the previous day, August 13, 2008, a different Postal Service employee

had conducted an unannounced audit of the East Hartford branch and "observed certain

inefficiencies and omissions on [Ware's] part, which she instructed you to correct. A short while

---

[3] According to Sullivan, in early 2008 the Postal Service had to settle over 100 grievances filed
by the National Association of Letter Carriers ("NALC") at a cost of over $200,000.00 because
the Postal Service did not have the documents required to demonstrate that it had complied with
the overtime provisions of the National Agreement between the Postal Service and the NACL in
instances when carriers who were not on the "overtime desired list" were scheduled for overtime
work. (Def. SJ Ex. 37, at 1, ¶ 6) (the designation "Def. SJ Ex." refers to exhibits submitted in
support of the defendant's motion for summary judgment).

later, I spoke with you about the audit and directed you to correct the inefficiencies." (Def. SJ
Ex. 28, at 1).

In his response to the second charge, Ware indicated that August 14, 2008 "proved to be
a very challenging day," in part because one supervisor had not arrived at the scheduled time in
the morning. (Def. SJ Ex. 27, at 4).  He also stated that many of the problems identified in the
audits were due to the mistakes of other Postal Service employees.

The third charge in the Notice, "AWOL," alleged that Ware failed to report for work on
July 24, 2008, despite the fact that Sullivan had denied Ware's request for annual leave for that
day. This charge referred to Ware's request for leave immediately before the scheduled route
adjustment at the East Hartford branch and the denials of his requests for annual, and then
emergency, leave. Ware had requested leave in order to be with his daughter in Washington,
D.C. for a basketball tournament.  After his requests for leave were denied, Ware left a phone
message advising the Acting Manager of Customer Service that he planned to be out sick until
Tuesday, July 29, 2008. Ware did not report to work on July 24, 2008.

The final charge in the Notice, "Falsification," alleged that Ware had signed a PS Form
3971[4] on August 18, 2008, attesting to the fact that he had been performing jury duty on August
15, 2008, knowing that he had not done so. On August 14, 2008, Ware faxed Sullivan a
Summons for Jury Service which required Ware to appear for jury duty on August 15, 2008. The
Summons advised Ware to call the automated jury information system after 5:30 p.m. the
evening before the report date to confirm he was still required to attend on the designated date,
i.e., August 15, 2008. Ware did not call the automated jury information system on August 14,
2008. Instead, he went to the courthouse on August 15, 2008, learned that jury duty was

_____

[4] The form in question is a "Request for or Notification of Absence" on which Ware requested 8
hours of time for court leave for August 15, 2008. (Def. SJ Ex. 38).

cancelled for that day and left the courthouse by 9:30 a.m. He then went to his doctor's office because he was not feeling well. The receptionist in his doctor's office scheduled Ware for a 2:45 p.m. appointment that day and he went home and took some medicine. Ware returned to his doctor's office for his 2:45 p.m. appointment, although he was feeling much better by that time. After his appointment, Ware went home. He did not report to work on that day.

In his response to the fourth charge, Ware did not deny signing the PS Form 3971 on August 18, 2008, which reflected his having taken 8 hours of court leave time on August 15, 2008. Rather, he stated that because he was not feeling well, he decided to visit his doctor after learning that jury duty had been cancelled and had not informed Sullivan of this because "[w]ith the incident that took place between [Sullivan] and I on August 6, where he threatened to fire me for being sick, I could not muster up the strength to tell him I was going to the doctor and await another denial." (Def. SJ Ex. 27 at 7).

On November 24, 2008, Martin issued a Letter of Decision regarding the Notice of Proposed Removal. In her decision, Martin stated that, "Although I find that the charges as stated in the proposed removal are fully supported by the evidence, it is my decision to reduce the proposed removal to a reduction in Grade/Pay. Effective December 6, 2008 you are being reassigned to the Manchester Post Office as a Part Time Flexible City Letter Carrier." (Def. SJ Ex 35, at 2). Martin's Letter of Decision also informed Ware of his appeal rights concerning her decision.  Martin's  Letter of Decision led to the demotion of Ware and a subsequent pay decrease.

DISCUSSION

A.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute."  *American  International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir.1981).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute concerning a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Id.*

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a

dispute as to the employer's intent . . . .  Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (citations omitted).  The nonmoving party must "'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). "[T]he standard for determining whether the evidence [is] sufficient to sustain the submission of plaintiff's case to the jury [is] simply whether on the basis of that evidence, a factfinder could reasonably find the essential elements of a case of discrimination . . . .  [E]mployers should not be held liable for discrimination in the absence of evidence supporting a reasonable finding of discrimination." *James v. New York Racing Association*, 233 F.3d 149, 154-55 (2d Cir. 2000).

## B.   DISPARATE TREATMENT

### i. Discrete Acts

Ware claims that beginning in March 2008, and ultimately resulting in his demotion in the same year, the Postal Service subjected him to specific adverse employment actions on the basis of his age, race, color, and sex.  The plaintiff alleges that the Postal Service discriminated against him in violation of the ADEA (as to age), and Title VII (as to race, color, and sex).

The ADEA states that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ."  29 U.S.C. § 623(a)(1).  The relevant Title VII provision states that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).

Claims of discrete acts of discrimination based on race, color or sex (Title VII), and claims based on age (ADEA), are both analyzed under the framework established in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1973); *Schnabel v. Abramson*, 232 F. 3d 83, 87 (2d Cir. 2000). The plaintiff has the initial burden of establishing a prima facie case of discrimination by demonstrating the following: "(1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell University*, 584 F.3d 487, 498 (2d Cir. 2009). "[I]f the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (internal quotation marks omitted). Finally, if the defendant has articulated a nondiscriminatory reason for its action, the plaintiff must be given the opportunity to prove that the legitimate reason offered by the defendant was untrue, and merely a pretext for discrimination.[5] *Id.*

The Postal Service presents no argument against the first two elements of the establishment of a prima facie case for discrimination. Ware has provided sufficient evidence to show that he was within a protected class, and that he was qualified for the position.

---

[5] The Supreme Court has elevated the ultimate burden on the plaintiff in ADEA claims. In order to prevail on a disparate treatment claim brought pursuant to the ADEA, the plaintiff must now prove that age was the "but-for" cause of the challenged adverse employment action. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 180 (2009). Nonetheless, the Second Circuit remains bound by the burden-shifting framework established in *McDonnell Douglas*. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010). Accordingly, the Court notes that the plaintiff's ultimate burden of proof as to his ADEA claims is higher, but will continue to apply the *McDonnell Douglas* burden-shifting framework.

The plaintiff must show that he suffered an adverse employment action in order to meet the third element of a prima facie case.  There is no bright-line test of what may or may not constitute an adverse employment action for purposes of the ADEA or Title VII; courts must thoroughly examine the details of each case in order to determine whether the challenged employment action has reached the level of "adverse." *See Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir. 1997).   An adverse employment action is "a materially adverse change in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (internal quotation marks omitted).  This materially adverse change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities . . . ." *Hrisinko v. N.Y. City Dept. of Education*, 369 F. App'x 232, 235 (2d Cir. 2010) (internal quotation marks omitted).  Examples of actions that may constitute adverse employment actions include termination of employment, demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities.  *Id.*  Ultimately, whether an action can be deemed to be materially adverse "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 71 (2006) (internal quotation marks omitted).

Ware alleges that he was subjected to discrimination by the Postal Service in connection with several events that occurred while he was a manager at the East Hartford branch.  Some of these events cannot meet the criteria for the third element of the prima facie case because they do not rise to the level of a materially adverse employment action.  The first of these events was a pre-disciplinary interview for the stated reason of failure to follow instructions.  This occurred after Ware's supervisors observed his work performance on a number of occasions and had determined that there was some sort of deficiency in getting the mail out under his command.

Even though this interview occurred within only a few weeks of Ware working in this new placement, it does not meet the standard for a materially adverse change in the conditions of his employment. This was only a meeting to discuss his performance up to that point and was not a reprimand or punishment for anything that he did or did not do. The next event that does not meet the criteria for an adverse employment action was the instance where the postmaster, Martin, called Ware's home telephone while he was on sick leave. Ware had called both Martin and Sullivan on the Saturday and Sunday prior to taking sick leave, leaving voicemail messages notifying them that he would be out sick. The following Monday, Martin called Ware at home and left a message with Ware's wife to call her back. Ware returned this call the next day and the two had a discussion about his sickness as well as his work performance. Despite the fact that Martin, rather than Sullivan (Ware's direct supervisor), called, this phone call in response to a voicemail left over the weekend regarding Ware's sickness cannot be considered an adverse employment action.

The May 9, 2008, proposed letter of warning in lieu of a fourteen-day suspension and the subsequent rescission of that letter also do not meet the standard for an adverse employment action. The letter was ultimately removed from Ware's official personnel file because he needed further training in the field related to the letter. Not only was the letter removed from Ware's file, but Martin also provided him with a training resource to contact. This does not constitute a materially adverse change in the terms or conditions of his employment.

The three situations in which Ware requested and was subsequently denied leave also do not meet the standard for an adverse employment action. At two different points in July 2008, and once in August 2008, Ware requested leave in order to attend his daughter's basketball tournament and help move his daughter back to college. The first request was for the two days

15

immediately preceding a scheduled route adjustment and Ware was needed at the station in order to make the necessary preparations.  The next two requests were made at times when the supervisor who worked for Ware had already taken annual leave, and Sullivan expressed his concern that the station could not operate properly with two- thirds of the management staff on leave.  After the requests for annual leave were denied in both July and August 2008, Ware then requested sick leave, despite his managers knowing that he had family obligations during those periods. Ware has provided medical documentation that he suffered a muscle strain a few days prior to his initially requested leave to move his daughter back to college.  Based on a history of requesting sick leave after an annual leave request had been denied, Ware's supervisors were reluctant to accept his claims.  The Court cannot find under the circumstances of this case that the denials of Ware's leave requests constituted a materially adverse change in the terms or conditions of his employment. *See Wharton v. County of Nassau*, 10-CV-0265 (JS)(AKT), 2013 U.S. Dist. LEXIS 129127, at *24 (E.D.N.Y. Sept. 10, 2013). ("Denials of vacation time are not adverse actions [for purposes of Title VII]."); *see also Terry v. Ashcroft*, 336 F.3d 128, 147 (2d Cir. 2003) ("The denial of restoration of lost leave time . . . is legally insufficient to constitute an adverse employment action.").

While the above-mentioned events do not meet the standard for an adverse employment action, there were events that do meet that standard.  The first event that supports the third factor for establishing a prima facie case was the March 12, 2008 proposed letter of warning in lieu of a seven-day suspension and the subsequent reduction to a letter of warning.  The letter was issued because Ware allegedly failed to perform the requirements of his position and failed to follow instructions.  After an appeal of the letter, Martin decided to reduce the letter of warning in lieu of a suspension to simply a letter of warning.  However, the letter was to be held in Ware's

personnel file for a period of six months, and if there were performance issues during that time, it would be held in his file for 2 years.  This Court has determined that circumstances such as these can be considered a "disciplinary probationary period" that may constitute an adverse employment action under Title VII.  *Abraham v. Potter*, 494 F. Supp. 2d 141, 148-49 (D. Conn. 2007) (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.2001)).  For purposes of determining whether Ware has established a prima facie case of discrimination, the Court will assume that the proposed letter of warning in lieu of a seven-day suspension and subsequent reduction to a letter of warning qualifies as an adverse employment action.

On September 19, 2008, Sullivan issued the Notice of Proposed Removal which eventually led to Ware's demotion and decrease in pay.  There is no question that this series of events constituted an adverse employment action because it materially changed Ware's terms and conditions of employment and was certainly more than a mere inconvenience or alteration of job responsibilities. The Court concludes that Ware has satisfied the third factor for establishing a prima facie case as to these two events, i.e., (1) the March 2008 proposed letter of warning in lieu of a seven-day suspension and the subsequent reduction to a letter of warning, and (2) the Notice of Proposed Removal and subsequent demotion and decrease in pay.

The fourth and final element for establishing a prima facie case of discrimination is that the adverse action occurred under circumstances giving rise to an inference of discrimination. The Court finds that Ware has failed to establish a connection between the adverse employment actions and any discriminatory behavior on the part of the Postal Service.  While the Court acknowledges that Ware's burden in establishing his prima facie case is minimal, *James v. N.Y. Racing Association*, 233 F.3d 149, 153-54 (2d Cir. 2000), he does not satisfy that minimal burden. He has provided no evidence that would support a finding of discrimination on the basis

of color, race, gender or age. Ware has provided nothing more than a statement that other similarly situated employees within the Postal Service who are not of the same color, race, gender or age were not subjected to the same levels of harassment.  This is a conclusory statement with no factual support.  Ware has failed to make any substantive connection between his protected characteristics and the actions that his supervisors and the Postal Service took. Ware argues that had he not been under such strict scrutiny he would have been able to perform his job better, and that the "micro-management" on the part of Sullivan and Martin was unnecessary.  These arguments are insufficient to demonstrate any discriminatory behavior; they are merely an assessment of the business decisions of the Postal Service. "'[F]ederal courts are not in the business of adjudging whether employment decisions are prudent or fair. Instead, [a federal court's] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.'" *Adams v. Yale-New Haven Hospital*, Civ. No. 3:06CV1166 (HBF), 2012 U.S. Dist. LEXIS 136933, at *28-29 (D. Conn. Sept. 25, 2012) (quoting *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002)).

Additionally, the Postal Service provided legitimate non-discriminatory reasons for any and all employment actions it took against Ware (i.e. failure to follow instructions, failure to satisfactorily perform duties, AWOL, and falsification) and Ware failed to provide evidence that would support a finding that the legitimate reasons offered by the defendant were untrue and merely a pretext for discrimination.  Ware has failed to establish a prima facie case of discrimination under either Title VII or the ADEA and for that reason his claims of discrete acts of discrimination in violation of those statutes fail.

ii. Hostile Work Environment

Hostile work environment claims are "different in kind from discrete acts," because "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Hostile environment claims "involve[] repeated conduct" and "are based on the cumulative effect of individual acts." *Id.* A number of factors are taken into account when determining whether a work environment is "hostile" for purposes of a claim founded on Title VII, including the frequency of the conduct, the severity, whether it is physically threatening or humiliating, and whether the conduct unreasonably interferes with the employee's work performance. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). The same standards that apply to a hostile work environment claim brought under Title VII apply to a hostile work environment claim brought under the ADEA. *See Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003).

In order to successfully prove a hostile work environment claim, the plaintiff must show: (1) "that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,"; and (2) "that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks omitted). Proving the first step involves both objective and subjective elements. The misconduct must be severe enough to create an objectively hostile environment, and the victim must also perceive that environment to be hostile. *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004). Proving the second element involves the plaintiff showing that the employer knew, or should have known, about the harassment but failed to take appropriate remedial action. *Fairbrother v. Morrison*, 412 F.3d 39, 49 (2d Cir. 2005).

Ware identifies three forms of conduct which, according to him, constituted a hostile work environment: (1) his supervisors conducted a number of unannounced inspections at the facility he supervised; (2) he was given unreasonable deadlines and insufficient support; and (3) he was subjected to a hostile pre-disciplinary interview.  Ware alleges, and Martin and Sullivan confirm, that Ware's facility was visited more often than other similar facilities.  The second claim Ware makes supporting his argument for a hostile work environment is that he was given unreasonable deadlines and insufficient support in accomplishing assigned tasks.   In August 2008 Ware was subject to inspections on two consecutive days and was expected to have made the necessary changes by the second inspection.  He also asserts that had he been provided with adequate support staff, his tasks would have been more achievable.  Finally, Ware alleges that he was subjected to a hostile pre-disciplinary interview on or about August 18, 2008.  Taking all of these events into account and assessing the totality of the circumstances, Ware has failed to successfully support a hostile work environment claim.

A supervisor closely monitoring a newly transferred manager within the first few weeks of a move does not constitute severe or pervasive harassment for purposes of a hostile work environment claim. With regard to his allegations of unrealistic deadlines and insufficient support, Ware "has provided no evidence that these instances of alleged mistreatment [including the imposition of unrealistic deadlines] rose beyond the level of ordinary workplace conflicts, which are not sufficiently severe or pervasive to support a hostile work environment claim." *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 165 (D.D.C. 2010). Finally, while Ware and Sullivan may not have seen eye to eye, and there may have been a "heated discussion" between the two at the August 8, 2008 pre-disciplinary interview, neither Title VII nor the ADEA is

intended to create a "general civility code for the American workplace." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

The Court finds that Ware has failed to support a hostile work environment claim. None of the actions taken by the Postal Service were sufficiently severe to alter the conditions of Ware's employment and create an abusive working environment.  Since Ware cannot satisfy the first requirement for a hostile work environment claim, it is unnecessary to evaluate the second element.  The Court notes further that Ware has failed to provide evidence that could support a linkage between the conduct about which he complains and the claimed grounds of discrimination, i.e., sex, race, color, and age. "Everyone can be characterized by sex, race, [and] ethnicity . . . and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Alfano*, 294 F.3d at 377. For this additional reason, Ware's hostile work environment claims fail.

## C.   RETALIATION CLAIMS

Ware claims that he was retaliated against by his employer after contacting and filing a complaint with the Equal Employment Opportunity Commission beginning on May 6, 2008. The relevant Title VII provision states "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Similarly, the ADEA provides that "[i]t shall be unlawful for an employer to discriminate against any of his employees . . . because such

individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this Act." 29 U.S.C. §623(d).

The anti-retaliation provisions of Title VII and the ADEA seek to prevent employers from interfering with access to remedial mechanisms by "prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *White*, 548 U.S. at 68 (internal quotation marks omitted).  Retaliation claims under Title VII and the ADEA are analyzed under the same *McDonnell Douglas* burden-shifting framework that applies to discrimination claims. *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 465 (2d Cir. 1997). To establish a prima facie case of retaliation, the plaintiff must show that: (1) he engaged in a protected activity; (2) his employer was aware of the activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the adverse action and the protected activity.  *See Kwan v. Andalex Group, LLC*, 737 F.3d 834, 844 (2d Cir. 2013).

It is not contested that Ware engaged in a protected activity or that the Postal Service was aware of the activity when he filed a complaint with the Equal Employment Opportunity Office on May 6, 2008.  Therefore, Ware meets the first two factors for establishing a prima facie case of retaliation.  With regard to the third factor, Ware must show that the actions taken by the Postal Service "would have been materially adverse to a reasonable employee . . . ." *White*, 548 U.S. at 57.  Actions are materially adverse if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* Ware's retaliation claims are based on the same actions he relied upon for his discrimination claims.

The pre-disciplinary interview based on a failure to follow instructions that occurred on March 7, 2008, as well as the March 12, 2008 proposed letter of warning in lieu of a seven-day suspension, which was subsequently reduced to a letter of warning, took place prior to the protected activity. Consequently, those events cannot support a retaliation claim. The next three events do not meet the standard for an adverse employment action because none of them were materially adverse to the point that they "could well dissuade a reasonable worker" from making or supporting a charge of discrimination.  The calls that Martin made to Ware's home were not materially adverse because they were made in response to voicemails that Ware left his supervisors regarding sick leave.  The next event was the May 9, 2008 proposed letter of warning in lieu of a fourteen-day suspension and the subsequent rescission of the letter.  That letter and subsequent rescission cannot be considered harmful to the point that it could have dissuaded Ware from making a claim of discrimination because it was removed from his file completely and Martin took steps to ensure that Ware received assistance in the area for which the letter was proposed in the first place.  With respect to the instances when Ware's leave requests were denied, the Court has previously indicated that those denials did not constitute a materially adverse change in the terms or conditions of Ware's employment for purposes of his disparate treatment claims and reaches the same conclusion as to his retaliation claims.

The only materially adverse employment action for the purposes of successfully advancing the third factor in establishing a prima facie case for retaliation is the Notice of Proposed Removal on September 19, 2008 and subsequent demotion and decrease in pay. This series of events adequately meets the standards of being "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 57.

23

"The Supreme Court recently held that 'Title VII retaliation claims must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Kwan*, 737 F.3d at 845 (quoting *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013)). The Second Circuit went on to indicate, however, that "the but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the prima facie stage . . . indirectly through temporal proximity." *Id.* The Second Circuit had previously determined that a causal connection could be established indirectly by showing that the adverse action closely followed the protected activity. *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

No bright line has been established to determine the temporal limit beyond which a connection can no longer be indirectly established for a prima facie case of retaliation. *Gorman-Bakos v. Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). Ware first contacted the EEOC in May 2008 and the Notice of Proposed Removal was issued approximately four months later, on September 19, 2008. Given the circumstances in this case, the passage of four months between the protected activity and the adverse employment action may well be too attenuated to establish a prima facie case of retaliation. *See Perry v. NYSARC, Inc.*, 424 F. App'x 23, 26 (2d Cir. 2011) (We have . . . concluded that even a four-month interval between the protected activity and alleged retaliation is insufficient in itself to establish the causal connection necessary to support a retaliation claim.").

Even if Ware had established a prima facie showing of retaliation on the basis of the temporal proximity between the protected activity and the adverse employment action, his retaliation claims would fail at the pretext stage of the *McDonnell Douglas* analysis. As noted

24

with respect to Ware's disparate treatment claims, the Postal Service articulated legitimate non-discriminatory reasons for any and all employment actions it took against Ware, thereby shifting the burden back to Ware to come forward with evidence that the Postal Service's non-discriminatory reasons were a mere pretext for retaliation. "Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." *Kwan*, 737 F.3d at 847. A plaintiff must identify "other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Id.* Ware has not come forward with other evidence, beyond temporal proximity, that the non-discriminatory reasons articulated by the Postal Service were a mere pretext and that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. For these reasons, Ware's retaliation claims fail.

CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment (**doc. # 62**) is **GRANTED**.

The Clerk is directed to close this file.

**SO ORDERED** this   4th    day of March, 2014.

___/s/ DJS_____
                    DOMINIC   J.   SQUATRITO
                    UNITED STATES DISTRICT JUDGE